UNITED STATES of America,
Plaintiff–Appellee,

v.

David Lowayne BOX, John Byron
Yarbrough, and Leroy Eugene
Burch, Defendants–Appellants.

No. 93–1674.

United States Court of Appeals,
Fifth Circuit.

April 11, 1995.

347

Gerhard Kleinschmidt (court appointed), Ft. Worth, TX, for Box.

Allan K. Butcher (court appointed), Fort Worth, TX and David Richards (for argument only), Arlington, TX, for Yarbrough.

Davis McCown (court appointed), Ft. Worth, TX, for Burch.

Delonia A. Watson, Asst. U.S. Atty., Richard H. Stephens, U.S. Atty., Frank D. Able, and Ronald C.H. Eddins, Asst. U.S. Attys., Ft. Worth, TX, for appellee.

Before REYNALDO G. GARZA, DeMOSS and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

David Lowayne Box, a bail bondsman, Leroy Eugene Burch, former Sheriff of Wise County, and John Byron Yarbrough, former Chief Deputy Sheriff, were convicted of one count of conspiracy to interfere with interstate commerce by extortion and various substantive counts of extortion, all in violation of the Hobbs Act. The offense conduct included a scheme designed to extort money (through bonds and fines) from travelers arrested at a roadside park in exchange for promises that the charges, usually public lewdness or indecent exposure, would be dropped or reduced. The roadside park was known to be the location of a significant amount of homosexual activity. The offense conduct also included a scheme to extort money from drug dealers in the guise of a legitimate forfeiture proceeding. Additionally, Box was convicted of two counts of making false tax returns.

Box, Yarbrough, and Burch challenge their convictions, claiming various grounds for reversal. Box also challenges the court's application of the sentencing guidelines. We find that three of the substantive convictions for extortion involving the arrests at the roadside park must be reversed because there was insufficient evidence to show that the offense conduct affected interstate commerce. Otherwise, we affirm the conspiracy convictions and remaining substantive counts. Additionally, we find that the district court erred in applying the vulnerable victim enhancement to Box's sentence, and thus, vacate and remand his sentence for further proceedings.

## I. PROCEDURAL HISTORY

A grand jury charged Box, Yarbrough, and Burch in an eleven-count indictment as follows:[1] count 1 charged all three appellants with conspiracy to interfere with interstate commerce by extortion in violation of 18 U.S.C. § 1951 (the Hobbs Act); counts 2

through 9 charged all three appellants with various substantive violations of 18 U.S.C. § 1951, specifically, interference with commerce by extortion;[2] and counts 10 and 11 charged Box with making and subscribing to false individual income tax returns for 1987 and 1988 in violation of 26 U.S.C. § 7206(1).

The three appellants were tried together before a jury. The district court directed a verdict of acquittal on count 6 as to all the defendants.[3] Box was convicted of the conspiracy count, seven counts of extortion (counts 2, 3, 4, 5, 7, 8, and 9) and two counts of filing a false income tax return (counts 10 and 11). Yarbrough was found guilty of the conspiracy count and six counts of extortion (counts 2, 3, 4, 5, 7, and 8). Yarbrough was acquitted of the extortion offense in count 9. Burch was convicted of the conspiracy count and one count of extortion in count 8. Burch was acquitted of the remaining six counts of extortion, all of which involved the arrests at the roadside park.

## II. SUFFICIENCY OF EVIDENCE

The appellants contend that their conspiracy and substantive convictions for extortion in violation of the Hobbs Act (18 U.S.C. § 1951) were not supported by sufficient evidence. Section 1951(a) provides that:

Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,-000 or imprisoned not more than twenty years, or both.

The statute defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or

---

1. A fourth defendant, James Howard Conner, Jr., was charged in Count 1 (conspiracy) and Count 8 (extortion count involving drug forfeiture). The jury acquitted Conner of both counts.

2. Counts two through seven and count nine involved the alleged extortion of certain individuals

arrested at a roadside park. Count eight involved the alleged extortion of certain drug dealers disguised as a drug forfeiture.

3. The named victim in count six was deceased at the time of trial.

threatened force, violence, or fear, or under color of official right." Section 1951(b)(2).

We review a challenge to the sufficiency of the evidence to determine whether a reasonable trier of fact could have found that the evidence established the defendant's guilt beyond a reasonable doubt. *United States v. Stephens*, 964 F.2d 424, 427 & n. 8 (5th Cir.1992). "A conviction under the Hobbs Act may be sustained by a finding that a public official has taken a fee, unlawfully, under color of his public office, in return for performance or nonperformance of an official act." *United States v. Wright*, 797 F.2d 245, 250 (5th Cir.1986), *cert. denied*, 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 495 (1987). "To convict for criminal conspiracy under 18 U.S.C. § 1951, the jury must find an agreement between two or more persons to commit a crime, and an overt act by one of the conspirators to further the conspiracy." *Stephens*, 964 F.2d at 427.

### A. INSUFFICIENT EVIDENCE TO SHOW MONEY NOT DUE THE OFFICE

■ The appellants argue that there was insufficient evidence to show that the $20,000 in forfeited drug proceeds was property not due the office. The pertinent part of the Hobbs Act "requires of the public official that he obtain 'property from another, with his consent, ... under color of official right.'" *Evans v. United States*, 504 U.S. 255, 265, 112 S.Ct. 1881, 1888, 119 L.Ed.2d 57 (1992) (quoting § 1951) (ellipsis in opinion). Construing that statute, the Supreme Court held "that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."[4]

The appellants claim that the forfeiture was legal under Texas law, and therefore, the government failed to prove that the Sheriff's Department was not entitled to the money. The government, relying on *McCormick v. United States*, 500 U.S. 257, 111 S.Ct. 1807,

114 L.Ed.2d 307 (1991), responds that whether the forfeiture was legal is not relevant. In *McCormick*, the defendant, an official, had been convicted of extortion under the Hobbs Act. He claimed that the monies he received were legitimate campaign contributions. The Court of Appeals had affirmed, rejecting McCormick's contention that conviction of an official under the Hobbs Act always requires proof of a *quid pro quo*. That court concluded that the statute did not require such proof when the parties had never intended the money to be legitimate campaign contributions. The Supreme Court reversed, holding that a *quid pro quo* is necessary for conviction under the Hobbs Act when an official receives a campaign contribution, regardless whether it is a legitimate campaign contribution.

Accordingly, in the case at bar, the government argues by analogy that simply because the transaction was "camouflaged" as a legitimate forfeiture does not immunize the defendants from prosecution. The forfeiture, the government argues, was orchestrated to hide its true character as an illegal *quid pro quo* transaction constituting extortion. On the facts of this case, we find the government's position persuasive.

Viewed in the light most favorable to the government, the evidence showed that, on April 18, 1988, officers of the Wise County Sheriff's Department executed a search warrant at a remotely located house used for the manufacture of amphetamines. Phillip Cox, Derrick Ives, and Paul Gatlin were arrested at the scene. When Cox arrived at the jail, he observed Box standing at a desk. Box took Cox aside and advised that if Cox used him as a bail bondsman, he would inform Cox of some loopholes in the case that would help Cox to obtain dismissal of the charges. At that time, Box did not give any specifics as to the "loopholes." The loophole was a defective search warrant. Deputy Yarbrough had prepared the search warrant which was de-

---

4. "[E]xtortion under color of official right means the wrongful taking by a public officer of money or property not due to the officer or the office."

fective due to inaccurate directions to the house.[5]

Cox paid Box to obtain bonds for the three men. Box also charged $6,000 in "private investigator's fees" to obtain the information regarding the "loopholes." Subsequently, Box and Cox met several times and discussed a $20,000 "pay off deal" that would result in the dismissal of the charges. Cox, however, was skeptical and concerned that Box was trying to "scam" him.[6] Cox wanted to meet with someone who could verify their agreement, and Box told him that he could talk to the Sheriff.

While on his way to meet with Box and the Sheriff, Cox and his companion Kit McManus had car trouble. Cox phoned Box and told him where the car had stopped. Box and the Sheriff arrived at the scene shortly thereafter. Box assured Cox that he did not need to worry because it was not "any big deal." He further stated that the Sheriff had more to lose than Cox did. Cox then entered the vehicle with the Sheriff. The Sheriff also assured Cox that he had nothing to worry about and that "it wasn't the first time that this had happened." Cox told the Sheriff that was enough verification for him. Cox testified that the Sheriff "seemed like the type of person that would be able to do something like that."

Subsequent to that meeting, Box instructed Cox to choose either Kit McManus or Charles Duckworth (two other individuals who had been involved with Cox in the manufacture of amphetamine) to surrender himself to the Wise County Sheriff's Department with $20,000 on hand for a "forfeiture." It was also determined that the person who surrendered himself would pay a bond fee of $15,000 and the charges would be dismissed at that time. Cox "chose" McManus.

In a rental car, Cox and McManus drove to Box's bail bond office with $35,000 in cash ($20,000 for the "forfeiture" and $15,000 for the bond fee). After Box counted the money, Box and McManus left to go to the jail while Cox remained at the bail bond office. Cox

became more apprehensive when he saw a police car, but the officer drove away without coming inside. McManus and Box subsequently returned and informed Cox that the "little deal was done." Upon McManus' surrender, the car was searched and the $20,000 in cash seized.

Dan Garrigan, the attorney representing Cox and McManus, went to see the district attorney after McManus' surrender and release. After that conversation, Garrigan stopped at Box's office, and the Sheriff and Deputy Yarbrough were present. Garrigan informed Box that the district attorney had indicated that he intended to proceed with both the criminal charges and the forfeiture. The Sheriff and Deputy Yarbrough were "clearly unhappy" with that information, and one of them indicated that "Mr. Morris hadn't been district attorney long, and he didn't understand the program." That person also indicated that he would talk to Morris. Garrigan testified that they were concerned because they did not have a legitimate basis for searching McManus' car. They were afraid that if Morris went ahead with the criminal case, they would not be able to keep the money.

Following his clients' instructions, Garrigan did not oppose the forfeiture proceeding and the $20,000 was forfeited in an agreed judgment. The district attorney did not prosecute Cox, Ives, Gatlin, or McManus. The twenty thousand dollars was divided evenly between the Sheriff's Department and the Wise County District Attorney's Office.

There is no allegation that the district attorney's office was involved in the orchestration of this forfeiture or that any of the $10,000 that office received was misappropriated. However, there was evidence indicating that Box and Yarbrough received some of the money that went to the Sheriff's Department through falsified receipts.

A receipt evidencing the sale of a cellular telephone in the amount of $2,500 was signed by Jackie Read. Read testified that the

---

*Stephens*, 964 F.2d at 429 (internal quotation marks and citations omitted).

5. The government argued that Yarbrough had purposely drafted a defective search warrant.

6. Cox testified that when he gave Box $15,000, Box gave him a receipt for only $5,000.

phone belonged to Box, and that he signed it as a favor to Box. Box told Read that it would not look good if he signed the receipt because he was the bail bondsman and friends with the Sheriff. Another receipt in the amount of $900 for a VCR and camcorder was signed by Cliff Matthews. Texas Ranger Phil Ryan testified that Box admitted that he had signed Cliff Matthews' name to that receipt.

Additionally, a receipt for $2,000 signed by Rhonda Sue Lewis was admitted into evidence. Lewis testified that she received $200 for assisting Deputy Yarbrough in a drug investigation. She further testified that the receipt was blank when she signed it. Burch was present when Lewis signed the receipt Deputy Yarbrough gave her.

The preceding evidence establishes that the seizure and the forfeiture of the $20,000 was orchestrated by the appellants to cover up the extortion. Indeed, because Box was waiting to greet Cox as he arrived at the jail immediately after his arrest with information regarding a "loophole" (that cost him $6,000 in private investigator fees), it appears that the extortion was planned prior to the execution of the search warrant. Such an inference supports the government's theory that the defect in the search warrant Yarbrough drafted was intentional.

It is undisputed that illegal drug proceeds may be seized and forfeited. However, in this case, the appellants did not discover the money while searching either the house or the arrested men at the scene of the drug bust. Instead, the $20,000 simply was the amount of money requested in order to dismiss the charges. Although it is apparent that any cash Cox forfeited would have been illegal drug proceeds, that was not the appellants' focus regarding the transaction. Additionally, the appellants allowed Cox (a drug dealer out on bond) to choose the cohort who would surrender himself, and the bond for this person was determined prior to the surrender. Lastly, the falsified receipts allowed the jurors to draw the inference that the money was divided among the appellants.

*Stephens,* 964 F.2d at 428. Accordingly, in regard to counts 1 and 8, we find the evidence established beyond a reasonable doubt that the appellants obtained a payment to which they were not entitled, knowing that the payment was made in return for official acts. *Cf. Town of Newton v. Rumery,* 480 U.S. 386, 401, 107 S.Ct. 1187, 1196, 94 L.Ed.2d 405 (1987) (O'Connor, J., concurring) (although the dismissal of criminal charges in exchange for dismissal of civil rights suit found enforceable, "[n]o court would knowingly permit a prosecutor to agree to accept a defendant's plea to a lesser charge in exchange for the defendant's cash payment to the police officers who arrested him.").[7]

■ In a related argument, Box contends that he cannot be guilty of extortion "under color of official right," because he was a bail bondsman, not a public official. However, we previously have acknowledged that private persons may be convicted of aiding and abetting a public official's extortion. *United States v. Tomblin,* 46 F.3d 1369, 1382 & n. 26 (5th Cir.1995) (citing *United States v. Margiotta,* 688 F.2d 108, 131 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983)); *see also Evans,* 504 U.S. at 263–64 & n. 13, 112 S.Ct. at 1887 & n. 13 (noting that several states had defined extortion broadly enough to include the conduct of a private individual). Accordingly, this claim affords Box no relief.

### B. INSUFFICIENT EVIDENCE OF EFFECT ON INTERSTATE COMMERCE

■ Box and Yarbrough argue that the government offered no evidence to show that the arrests of individuals committing crimes in violation of state laws at the rest area park in Wise County, Texas affected interstate commerce. The statute defines "commerce" to mean:

> commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the

---

7. Box also argues that there was no wrongful conduct shown regarding the arrests at the roadside park. Contrary to his assertion, there was sufficient evidence to show that the arrests were made without probable cause.

District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

Section 1951(b)(3). Proving that interstate commerce has been affected is critical because federal jurisdiction rests on that basis. *Wright*, 797 F.2d at 248. However, the effect on commerce need only be slight. *Tomblin*, 46 F.3d at 1482. The determination whether interstate commerce has been affected is made on a case-by-case basis. *Wright*, 797 F.2d at 248.

In *Stephens, supra*, we found a sufficient effect on interstate commerce based on the following evidence.

The highway on which the cars were stopped and towed was six-tenths of a mile of U.S. Highway 171, a major four-lane highway that runs north and south through the western corridor of Louisiana. This highway provides access to other highways that lead to Texas if one travels west, and to Arkansas if one travels north. Testimony introduced at trial indicates that most of the people who were stopped and had their cars towed were not local residents, but individuals travelling to other states. Accordingly, we find Stephens' argument that interstate commerce was not affected to be without merit.

*Stephens*, 964 F.2d at 429.

In the case at bar, the arrests occurred at a roadside park on U.S. Highway 287, which also provided access to other highways leading to other states. The detained travelers were residents of various states, including Oklahoma, South Carolina, Louisiana, and Colorado. They were traveling to and from such places as New Mexico, Oklahoma, Louisiana, Colorado, and Seoul, Korea.

The only significant difference between *Stephens* and the case at bar is that here, the arrests were made at a roadside park adja-

cent to the U.S. Highway, and in *Stephens,* the vehicles were stopped actually on the highway. However, it is apparent that the roadside park was constructed for such interstate travelers to provide comfort for them and to facilitate their travels.[8] Further, the travelers undoubtedly were delayed by the arrests. Although the interference with interstate commerce may have been minimal, that is all that is required. *See United States v. Villarreal,* 764 F.2d 1048, 1052 (5th Cir.), *cert. denied,* 474 U.S. 904, 106 S.Ct. 272, 88 L.Ed.2d 233 (1985). We are persuaded that it was sufficient to sustain Box's and Yarbrough's conspiracy convictions under the Hobbs Act.[9] Nevertheless, we must make a closer examination of the evidence to determine if it is sufficient to sustain each substantive conviction under the Hobbs Act based on the arrests at the roadside park.

■ In regard to counts 2, 4, and 7, the named extortion victims lived in Texas and were traveling between locations within the state. Because they were Texas residents and traveling within the state, there has been no showing that interstate commerce was affected. We do not believe that even a slight effect on interstate commerce was occasioned simply because of the location of the roadside park, or because of such location in conjunction with the extortion visited upon an intrastate traveler. The convictions of Box and Yarbrough for the Hobbs Act violations in counts 2, 4, and 7 must be reversed for insufficient evidence.

■ The named extortion victim in count 3 was a Texan traveling from Fort Worth to Oklahoma. Count 5 involved an Austin, Texas resident traveling to Colorado and New Mexico. Finally, the named victim in count 9 was a Colorado resident traveling through Texas on his way to Oklahoma. Thus, the evidence was sufficient to show that interstate commerce was affected as to counts 3, 5, and 9. The convictions of Box and Yar-

---

**8.** There was testimony that it was "the only roadside park with a restroom between Decatur and Henrietta."

**9.** Because we rejected Burch's claim that the conspiracy theory regarding the drug forfeiture

was legally deficient, we need not address his evidentiary challenge to the conspiracy theory involving the roadside arrests. *Tomblin,* 46 F.3d at 1385–86.

brough pursuant to counts 3, 5, and 9 (Box only) must be affirmed.

■ Next, all three appellants contend that, as to the counts involving the forfeiture of the drug proceeds,[10] the government failed to demonstrate any affect on interstate commerce. That argument is precluded by this Court's decision in *United States v. Davenport*, No. 93–1216, 36 F.3d 89 (5th Cir. Sept. 6, 1994) (unpublished), which is binding on this panel. In *Davenport*, we rejected the argument that illegal drug business is not the type of interstate commerce that the Hobbs Act was intended to protect. There, two former police officers and an accomplice were convicted of, among other things, conspiracy to extort cash payments from drug dealers in violation of the Hobbs Act. Recognizing that we "previously held that 'drug trafficking affects interstate commerce,' "[11] and that such holding was based on Congress' findings,[12] we therefore reasoned that extortion which depleted funds otherwise available for drug trafficking obstructed interstate commerce within the meaning of the Hobbs Act.

## III. JURY INSTRUCTIONS

### A. INTERSTATE COMMERCE NEXUS

■ The appellants contend that the charge is defective because it required only that the jury make a general determination whether the defendants' conduct interfered with or affected interstate commerce. Instead, the appellants argue, the charge should have required the jury to make a determination whether specific facts occurred constituting interference with interstate commerce. They also contend that the charge is defective because it gives the jury (rather than the court) the duty to make the legal determination whether interstate commerce was affected.

This Court reviews "jury instructions to determine whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *United States v. Snyder*, 930 F.2d 1090, 1093 (5th Cir.) (internal quotation marks and citations omitted), *cert. denied*, 502 U.S. 942, 112 S.Ct. 380, 116 L.Ed.2d 331 (1991).

The court below charged the jurors as follows: [13]

For you to find the defendant you have under consideration guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First:* That the defendant obtained property from another with that person's consent;

*Second:* That the defendant knowingly and willfully did so by wrongful use of actual or threatened force, violence, fear, or under color of official right; and

*Third:* That the defendant's conduct interfered with or affected interstate commerce.

The court further instructed the jury that the word " 'interstate commerce' means commerce or travel between one state, territory or possession of the United States and another state, territory or possession of the United States. . . ." The court also defined the phrase "obstructs, delays, or affects commerce" as:

any action which, in any manner or to any degree, interferes with, changes, or alters the movement or transportation or flow of goods, merchandise, money, or other property in commerce. All that is necessary is

---

10. Count 1 was the conspiracy count, and the extortion disguised as forfeiture of drug proceeds was listed as an overt act of the conspiracy. Count 8 was the substantive count involving the extortion disguised as forfeiture of drug proceeds.

11. *United States v. Gallo*, 927 F.2d 815, 823 (5th Cir.1991).

12. 21 U.S.C. § 801(3) & (4).

13. Although the court's charge essentially is taken from the Fifth Circuit Pattern Jury Instruction No. 2.69, the following excerpt from that pattern jury instruction was not provided to the jury: "In this case, the government argues that ___ [describe theory]. If you find that the government has proved this beyond a reasonable doubt, then the necessary effect on interstate commerce has been shown." (brackets in original).

that the impact of the extortion affect interstate commerce to a minimal degree. It is not necessary for the government to prove that the defendant actually intended to obstruct, delay, or affect commerce. The government must prove beyond a reasonable doubt, however, that the defendant deliberately performed an act, the ordinary and natural consequences of which would be to obstruct, delay, or affect commerce, and that commerce was, in fact, obstructed, delayed or affected. It does not matter whether the defendant knew that his conduct would interfere with or affect interstate commerce.

The question whether to summarize the facts with respect to the interstate aspect of the case is one within the trial court's discretion. *United States v. Hyde*, 448 F.2d 815, 842 (5th Cir.1971), *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972).[14] Because the charge, read as a whole, is a correct statement of the law, the district court did not abuse its discretion in declining to summarize the facts constituting interference with interstate commerce in this case. *Hyde*, 448 F.2d at 842.

■ Likewise, the appellants' claim that the court improperly delegated its duty to

the jury to make the legal determination whether interstate commerce was affected is without merit. The district court, in denying their motions for judgment of acquittal, implicitly found that the allegations in the indictment, if believed, would constitute interference with interstate commerce. Under such circumstances, the matter was appropriate for the jury.

B. "WRONGFUL CONDUCT" ELEMENT OF HOBBS ACT VIOLATION

■ The appellants, relying on *Evans v. United States*, 504 U.S. 255, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992), next contend that the court erroneously refused an instruction which explained to the jury how to distinguish lawful payments from extortion under the Hobbs Act.[15] This Court reviews jury instructions for an abuse of discretion. *Tomblin*, 46 F.3d at 1378. " 'The refusal to give a jury instruction constitutes error only if the instruction (1) was substantially correct, (2) was not substantially covered in the charge delivered to the jury, and (3) concerned an important issue so that the failure to give it seriously impaired the defendant's

14. In *United States v. Hooper*, 575 F.2d 496, 497 (5th Cir.), *cert. denied*, 439 U.S. 895, 99 S.Ct. 256, 58 L.Ed.2d 242 (1978), we found no error in the ensuing instruction:

[i]t is the duty of the Court and not the jury to determine whether the Government's evidence, if you believe it beyond a reasonable doubt, established that interstate commerce was affected by the conduct of the defendants so as to bring the activities of the defendants within the scope of the Hobbs Act and sustain Federal jurisdiction.

In other words, with respect to the interstate commerce aspects of the indictment, you need only to decide whether you believe beyond reasonable doubt the evidence offered by the Government to establish an effect on interstate commerce. Therefore, I charge you that the evidence in this case, if you thus believe it, meets the requirements of Title 18, Section 1951, United States Code, insofar as the conduct of the defendants has affected interstate commerce, and thereby sustains the Court's jurisdiction within the scope of the Hobbs Act.

15. The appellants requested the following instruction:

The Defendants presented a defense to some of these charges that the moneys paid by the

individuals arrested at the park were legitimate fees owed to the bonding company for bonding the individuals out of jail and that the $20,000.00 forfeited to the District Attorney's and Sheriff's offices was a forfeiture pursuant to state law.

The receipt of a fee by a bondsman in exchange for posting a bail bond is a necessary and permissible form of business on the part of persons in the business of posting bail bonds.

In addition, the forfeiture of property from individuals that are involved in the illegal manufacture and distribution of controlled substances is legal and proper under the Texas State law.

Thus, the acceptance by a bondsman of a fee for his services or the forfeiture of property from individuals participating in illegal controlled substances transactions does not, in itself, constitute a violation of the Hobbs Act.

However, if a public official demands or accepts money in exchange for a specific requested exercise of his or her official power, such a demand or acceptance does constitute a violation of the Hobbs Act regardless of whether the payment is made in the form of a bonding fee or a forfeiture of property.

ability to present a given defense.'" *Id.* at 1378–79 (quoting *United States v. Pennington,* 20 F.3d 593, 600 (5th Cir.1994)) (other citations omitted).

In *Tomblin, supra,* the appellant raised an analogous claim, and we opined that a jury instruction must adequately distinguish between the intent behind a lawful campaign contribution and the intent behind an unlawful bribery. There, the trial court charged the jury on the bribery issue using Fifth Circuit Pattern Jury Instruction Nos. 2.13 and 2.12. We noted that while use of a pattern instruction was not conclusive, we encouraged their use.[16] *Tomblin,* 46 F.3d at 1380 n. 16. We found that although Tomblin's requested charge sharply focused on the particular facts of the case as they pertained to his defense, the court's charge as submitted allowed him to present his defense to the jury.

In case at bar, the court's charge instructed the jury that:

"Wrongfully obtaining property under color of official right" is the taking or attempted taking by a public officer of property not due to him or his office, whether or not the public official employed force, threats, or fear. In other words, the wrongful use of otherwise valid official power may convert dutiful action into extortion. If a public official accepts or demands property in return for promised performance or nonperformance of an official act, the official is guilty of extortion. This is true even if the official was already duty bound to take or withhold the action in question, or even if the official did not have the power or authority to take or withhold the action in question, if the victim reasonably believed that the official had that authority or power.

The government points to a similar instruction approved in *United States v. Dozier,* 672 F.2d 531, 540 n. 6 (5th Cir.), *cert. denied,* 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982). We find that the appellants have neither shown that the proposed instruction was not substantially covered in the actual charge nor that their ability to present their defense was seriously impaired.

## IV. CLAIM OF IMPROPER IMPEACHMENT EVIDENCE

Yarbrough contends that the district court erroneously ruled that, if he elected to testify, then the government would be allowed to impeach him with evidence of an unrelated capital murder conviction. Yarbrough did not testify.

Rule 609(a)(1) provides that evidence that an accused has been convicted of a crime punishable by death or imprisonment in excess of one year shall be admitted if the court finds that the probative value of admitting this evidence outweighs its prejudicial effect to the accused. The court below, on the record, referenced the proper analysis before denying the defendant's request. No abuse of discretion has been shown. *See United States v. Turner,* 960 F.2d 461, 465 (5th Cir.1992) (trial court did not abuse its discretion in allowing government to establish on cross-examination that defendant had been convicted of aggravated sexual abuse, burglary of a habitation, and possession of a deadly weapon in a penal institution); *United States v. Barnes,* 622 F.2d 107, 109 (5th Cir.1980) ("The conviction [for heroin possession] was relevant as evidence of the defendant's criminal nature from which the jury could infer a propensity to falsify testimony.").[17]

## V. ADMISSION OF DOCUMENTS

Under the Federal Rules of Evidence, written documents introduced for the truth of the statements contained therein are generally inadmissible as hearsay unless they meet one of the recognized hearsay excep-

---

**16.** The court below used Fifth Circuit Pattern Jury Instruction No. 2.69.

**17.** *See also United States v. Brackett,* 582 F.2d 1027 n. 1 (5th Cir.1978) (without discussion, we opined that the district court did not err by "[r]efusing to suppress, as impeaching evidence pursuant to Fed.R.Evid. 609, evidence of Appellant's prior bank robbery and manslaughter convictions, thereby effectively preventing Appellant from testifying in his own behalf."), *cert. denied,* 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 473 (1979).

tions. 2 McCormick on Evidence § 284, at 262–63 (4th ed. 1992). The two hearsay exceptions relevant to this appeal are "Records of Regularly Conducted Activity" in Rule 803(6), and "Public Records and Reports" in Rule 803(8).

## A. AUTHENTICATION OF RECORDS UNDER FED.R.EVID. 803(6)

 Burch and Box contend that records from the Wise County Attorney's office were erroneously admitted into evidence because they were not authenticated. The records concerned people who had been arrested in Wise County for public lewdness and indecent exposure offenses in 1987 and 1988. They contend that the witness called to authenticate the records, County Attorney Stephen Hale, was not county attorney at the time the records were made, and he thus could not properly authenticate them. They further contend that because part of the government's case was its claim that records were "lost" or irregular, it was especially important for the government to establish that the records introduced were authentic.

 The primary focus of the public records hearsay exception in Rule 803(6) is on the reliability or trustworthiness of the records sought to be introduced, and that rule sets forth its own basis for authentication. *United States v. Veytia–Bravo*, 603 F.2d 1187, 1188–89 (5th Cir.1979), cert. denied, 444 U.S. 1024, 100 S.Ct. 686, 62 L.Ed.2d 658 (1980).[18] The trial court has broad discretion to determine the admissibility of the documents. *Id.* A qualified witness is one who can explain the system of record keeping and vouch that the requirements of Rule 803(6) are met; the witness need not have personal knowledge of the record keeping practice or the circumstances under which the objected to records were kept. *United States v. Iredia*, 866 F.2d 114, 119–20 (5th Cir.), cert. denied, 492 U.S. 921, 109 S.Ct. 3250, 106 L.Ed.2d 596 (1989).

The court below found that "the proper indicia ... of reliability has been shown in the identification by the last witness, Hale, that he could recognize the records, knew that they were from his office, and he testified to the other requirements of the business records." The appellants have failed to show that the district court abused his discretion in admitting the records.

## B. ADMISSIBILITY OF RECORDS UNDER FED.R.EVID. 803(8)

 The appellants contend that the district court erred in admitting various records from the Wise County sheriff's office, including jail cards, arrest reports, record bail books, and jail logs. All three appellants objected to the admission of these records, complaining that they were not admissible under Rule 803(8) because the public records exception explicitly excludes "in criminal cases matters observed by police officers and other law enforcement personnel." The appellants cited *United States v. Cain*, 615 F.2d 380, 382 (5th Cir.1980), which held that reports excluded by Rule 803(8) may not be admitted merely because they satisfy the regularly-kept-records exception of Rule 803(6).

Relying on *United States v. Quezada*, 754 F.2d 1190 (5th Cir.1985), the court below overruled their objection and admitted the records from the sheriff's office. In *Quezada*, this Court explained that:

> The law enforcement exception in Rule 803(8)(B) is based in part on the presumed unreliability of observations made by law enforcement officials at the scene of a crime, or in the course of investigating a crime.... Thus, a number of courts have drawn a distinction for purposes of Rule 803(8)(B) between law enforcement reports prepared in a routine, non-adversarial setting, and those resulting from the arguably more subjective endeavor of investigating a crime and evaluating the results of that investigation.

---

**18.** *See also* Fed.R.Evid. 901(a) ("[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims").

754 F.2d at 1193–94.[19]

The government contends that the records at issue were properly admitted under *Quezada* as routine, objective observations made as part of the everyday function of the preparing official, and were not made for the purposes of prosecuting the individual being described in the report. Thus, the government argues, the concerns of the "law enforcement" clause are not implicated. We find this reasoning persuasive. The law enforcement clause has no applicability in that it was designed to protect the arrested individual from being convicted based on unreliable hearsay, *e.g.*, the police officer's perceptions in an adversarial investigation. In contrast, in the instant case, the records were admitted against the officers and the co-conspirators who were keeping the records. Viewed in that light, the records were more akin to an "admission" than unreliable hearsay. The use of the records certainly do not implicate the concern of *Quezada* as the records from the sheriff's office were not made pursuant to the investigation of the instant offenses. The district court did not abuse its discretion in admitting the records from the sheriff's office.

## VI. DENIAL OF SEVERANCE MOTION

Box moved to sever his trial from that of Yarbrough, Burch, and Conner, and also to sever the income tax counts pursuant to Federal Rules of Criminal Procedure 8(b) and 14. The trial court denied the motion to sever, finding that joinder was proper under Rule 8(b) and that cautionary instructions would cure any potential prejudice.

■■■ The initial joinder of Box, Yarbrough, Burch and Conner for trial was legitimate because they were charged with having conspired with each other. *United States v. Elam*, 678 F.2d 1234, 1250 (5th Cir.1982). The district court's decision of whether to grant a severance under Rule 14 because of prejudice is reviewable only for an abuse of discretion. *United States v. Stotts*, 792 F.2d 1318, 1321 (5th Cir.1986); *see also United*

States v. Salomon, 609 F.2d 1172, 1175 (5th Cir.1980) (to establish an abuse of discretion of the district court, a defendant must show that he received an unfair trial and suffered compelling prejudice against which the trial court was unable to afford protection.). An appellant must demonstrate something more than the fact that a separate trial might offer him a better chance of acquittal. *United States v. Berkowitz*, 662 F.2d 1127, 1132 (5th Cir.1981).

■■■ Box contends that the pretrial publicity (regarding Yarbrough's murder conviction and the Sheriff taking vacation after the investigation) "spilled over into the trial even though the trial judge diligently attempted to screen out those individuals who stated that they had formed an opinion which they would not be able to shake." Box, however, has failed to demonstrate any actual prejudice. Further, because the district court allowed extensive voir dire regarding the pretrial publicity and admonished the jury to avoid any news sources, no abuse of discretion was shown. *United States v. Cravero*, 545 F.2d 406, 412 (5th Cir.1976), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977).

■■■ Box next contends that he should have been tried separately because he was unable to call his codefendants to testify. Because Box completely failed to show that his codefendants would have testified on his behalf at a separate trial, this claim is without merit. *United States v. Kane*, 887 F.2d 568, 573 (5th Cir.1989), *cert. denied*, 493 U.S. 1090, 110 S.Ct. 1159, 107 L.Ed.2d 1062 (1990).

■■■ Box also claims that the joinder of the extortion counts with the income tax counts "denied him his Fifth Amendment privilege, as he could not offer testimony on either group of charges without subjecting himself to cross-examination on the other." Box fails to reveal any testimony he would have given had there been a severance. He therefore has shown no prejudice. *United*

---

**19.** Significantly, in *Quezada*, we acknowledged our holding in *Cain* and found that it was not contrary to our decision. *Id.* at 1193 n. 9.

*States v. Davis,* 752 F.2d 963, 972 (5th Cir. 1985).

■ As the government asserts, most of the prejudicial evidence and hostile defenses Box complained of were never before the jury. Finally, the district court did not abuse its discretion in refusing to sever the income tax counts, because the underlying offense of extortion generated part of the income upon which the tax offenses were based.

## VII. BOX'S SENTENCE

Box was sentenced to 60 months each on Counts 1, 2, 3, 4, 5, 7, 8, and 9, and 36 months each on Counts 10 and 11, all terms to be served concurrently. The district court also imposed a $500 special assessment and a $10,000 fine. Box raises four challenges to the district court's application of the sentencing guidelines.

■ This Court reviews the district court's application of the sentencing guidelines *de novo,* while reviewing findings of fact under a clearly erroneous standard. *United States v. Brown,* 7 F.3d 1155, 1159 (5th Cir. 1993). Due deference is given to the district court's application of the guidelines to the facts. *United States v. Otero,* 868 F.2d 1412, 1414 (5th Cir.1989); *see also* 18 U.S.C. § 3742(e).

## A. ADJUSTMENT FOR BRIBING ELECTED OFFICIAL

■ Box argues that the district court in assessing an eight-level adjustment pursuant to § 2C1.1(b)(2)(B), which provides that "[i]f the offense involved a payment for the purpose of influencing an elected official or any official holding a high level decision-making or sensitive position, increase by 8 levels." The commentary to that guideline explains that an such an official "includes, for example, prosecuting attorneys, judges, agency administrators, supervisory law enforcement officers, and other governmental officials

with similar levels of responsibility." Section 2C1.1, comment. (n. 1).

Box argues that because Sheriff Burch, the elected official, was acquitted of the substantive counts of extortion involving the roadside park arrests, there was no "official." Notwithstanding the acquittal of Burch for the substantive counts, we find that Chief Deputy Yarbrough was a supervisory law enforcement officer within the meaning of the commentary to § 2C1.1. This claim is without merit.

## B. ADJUSTMENT FOR VULNERABLE VICTIMS

■ The district court found that the individuals arrested at the roadside park were "vulnerable victims" pursuant to § 3A1.1 and added two offense levels.[20] Section 3A1.1 provides that "[i]f the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels." The commentary states that the adjustment is applicable when the defendant selects an unusually vulnerable victim for his criminal activity. Section 3A.1, comment. (n. 1). It also provides scenarios demonstrating whether the adjustment should be applied. For instance, it would apply if a defendant marketed a bogus cure for cancer in a fraud case or if a defendant selected a handicapped victim to rob. *Id.* It would not apply, however, to a bank teller solely because of the teller's position in the bank. *Id.*

■ The finding "of 'vulnerability is a complex fact dependent upon a number of characteristics which a trial court could not possibly articulate completely,' and is certainly 'not reducible to a calculation of the victim's age or to a diagnosis of the victim's disease.'" *Brown,* 7 F.3d at 1160 (quoting *United States v. Mejia–Orosco,* 868 F.2d 807, 809 (5th Cir.), *cert. denied,* 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989)). Accord-

---

**20.** For example, the presentence report (which was adopted by the court), provided that one named victim, "[o]n the date of his arrest, ... was driving a Maserati and was employed in the oil/gas business. Mr. Cash was particularly susceptible to the crime because he drove an expensive automobile and was likely targeted for arrest because of it."

ingly, we give the finding of vulnerability due deference. *Brown*, 7 F.3d at 1160.

The government claims that the roadside park arrestees were all white-collar professionals who were not local residents, and that fighting a stigmatizing "morals" charge in a county away from home would have caused them emotional and financial problems. Therefore, the government argues that the victims were vulnerable in that they were not likely to complain because of their professions and positions in their communities, and because "it would have been a credibility contest between the victims and a Wise County deputy." Box disputes the government's characterization of these facts, claiming that the roadside park arrestees were not the type of "vulnerable" victims contemplated by § 3A1.1.

In *United States v. Moree*, 897 F.2d 1329 (5th Cir.1990), the defendant's offense arose from his offer to "fix" the trial of an indicted public official, and the district court applied the vulnerable victim adjustment. There, the victim's particular susceptibility to the crime was his prior indictment. *Id.* at 1336. We concluded that although that such vulnerability made the crime possible, it did not make the victim an unusually vulnerable victim. *Id.* We explained that "neither a businessman nor a bank should be considered unusually vulnerable to armed robbery merely because the bank robber knows they have cash on hand or may have some breach in their security system." *Id.*

Similarly, in the case at bar, if the victims had unsullied reputations and significant financial resources, those alleged "vulnerabilities" simply made the extortion possible. We find that the victims were not particularly susceptible within the meaning of § 3A1.1, and thus, the district court erred in applying this enhancement. *Cf. Brown*, 7 F.3d at 1160–61 (defendant targeted lonely, elderly widows in money order scam and court properly applied § 3A1.1 adjustment); *United States v. Rocha*, 916 F.2d 219, 244–45 (5th Cir.1990) (vulnerable victim in that kidnap victim was under 18 years old and still terri-

fied at trial), *cert. denied*, 500 U.S. 934, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991); *United States v. Bachynsky*, 949 F.2d 722 (5th Cir. 1991) (adjustment applied in fraud case when patients of defendant physician were given false information regarding their medical status), *cert. denied*, —— U.S. ——, 113 S.Ct. 150, 121 L.Ed.2d 101 (1992).

## C. DOUBLE COUNTING

█ Box claims that the two-level increase in his offense level under § 2T1.3(b)(1) "amount[ed] to a doubling up of guideline levels for conduct already contemplated under the Extortion charges."

The base offense level for subscribing to false income tax returns in violation of 26 U.S.C. § 7206(1), Box's offense of conviction in counts 10 and 11, was found in § 2T1.3(a)(1).[21] Additionally, § 2T1.3(b)(1) provided that the offense level should be increased by 2 levels if the defendant failed to report the source of income exceeding $10,000 in any year from criminal activity. The presentence report stated that Box failed to report $10,268.37 in 1987, and $20,537.66 in 1988, and thus, the two-level increase was assessed. The base offense level for the extortion in violation of the Hobbs Act was found in § 2C1.1(a).

█ The sentencing guidelines do not prohibit all double counting. *United States v. Godfrey*, 25 F.3d 263, 264 (5th Cir.), *cert. denied* —— U.S. ——, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994). Double counting is prohibited only if the particular guidelines at issue forbid it. *Id.* Even assuming *arguendo* that there was double counting, we have found no express language in the guidelines prohibiting this enhancement. *See Rocha*, 916 F.2d at 242–44 (court properly allowed enhancement for a ransom demand and the offense of extortion). Also, it should be noted that because the sentence was computed pursuant to the grouping rules of §§ 3D1.4 and 3D1.2(d), the addition of the two levels added nothing to Box's sentence.

**21.** To arrive at the base offense level, § 2T1.3(a)(1) directed the reader to the Tax Table in § 2T4.1.

### D. CRIMINAL HISTORY CATEGORY SCORE

Box contends that the district court improperly assessed one point to his criminal history score for his prior assault conviction. The sentence for Box's prior assault conviction "was imposed within ten years of the defendant's commencement of the instant offense" and therefore, pursuant to §§ 4A1.1(c) and 4A1.2(e), the one point was properly added to his criminal history score. *See United States v. Lopez,* 923 F.2d 47, 48 (5th Cir.), *cert. denied,* 500 U.S. 924, 111 S.Ct. 2032, 114 L.Ed.2d 117 (1991). Box, citing no authority for this proposition, asserts that the prior conviction should not have been considered because of the "four year delay between the 'commencement of [the instant] offense' and the trial."

Box has failed to show that the court incorrectly applied the guidelines. *See United States v. Matovsky,* 935 F.2d 719, 721 (5th Cir.1991) (citing 18 U.S.C. § 3742(e)). Moreover, as the government asserts, if this one point had not been counted, Box's criminal history category (I) would have remained the same. This contention will afford Box no relief.

In conclusion, we also reject Box's claim that the evidence is insufficient to support his two convictions (counts 10 and 11) for filing a false income tax return in violation of 26 U.S.C. § 7206(1). There is ample evidence to sustain the convictions. With respect to the remaining arguments of Box, we have considered briefs and oral arguments of counsel and the pertinent parts of the record, and conclude there is no error requiring reversal.

### CONCLUSION

For the above stated reasons, Yarbrough's convictions as to counts 1, 3, 5, and 8 are AFFIRMED, and Yarbrough's convictions as to counts 2, 4, and 7 are REVERSED; Burch's convictions are AFFIRMED; and Box's convictions as to counts 1, 3, 5, 8, 9, 10, and 11 are AFFIRMED, Box's convictions as to counts 2, 4, and 7 are REVERSED, and

Box's sentence is VACATED and REMANDED for further proceedings.