United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 19, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 05-20545
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SAM JIMMIE MANN,

Defendant-Appellant.

_____

On Appeal from the United States District Court
for the Southern District of Texas
4:03-CR-314-1

_____

Before GARWOOD, WIENER, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Sam Jimmie Mann appeals his convictions for extortion under color of official right, wire fraud, and conspiracy to commit these and other crimes. Mann also challenges the sentencing enhancements and restitution ordered by the district court following conviction. For the following reasons, we REVERSE his convictions on five counts and AFFIRM all others. We also AFFIRM the sentence.

## I. FACTS AND PROCEEDINGS

Mann served as police commissioner for the city of Kendleton, Texas, from 1996

until 2000. In 2003, a grand jury indicted Mann on 52 counts stemming from his alleged misdeeds during his time as police commissioner. A jury found Mann guilty of all 52 counts, but the trial judge granted Mann's motion for acquittal as to counts 5 and 6. The judge then sentenced Mann to serve 60 months of imprisonment on count 1 and counts 10 through 52, and 63 months of imprisonment on counts 2, 3, 4, 7, 8, and 9, all such terms to run concurrently. The district court also ordered, *inter alia*, that Mann pay $390,931.57 in restitution. On appeal, Mann challenges the sufficiency of the evidence underlying all of his convictions. He also asserts that the district court made numerous errors in calculating his offense level under the United States Sentencing Guidelines and that the amount of restitution it ordered was an abuse of its discretion.

The following facts were adduced at Mann's trial. Kendleton is a small town of about 600 people in Fort Bend County, Texas. United States Highway 59 passes through the center of the town on its northbound route to Houston. In 1996, the mayor of Kendleton, Carolyn Jones, hired Mann to serve as police commissioner. Prior to Mann's arrival, Kendleton did not have a police commissioner, and the Kendleton Police Department ("KPD") was headed by Clarence Hodges, who had been named police chief in 1996. Mann served as police commissioner, a position superior to police chief, until his termination in March of 2000.

## A. The warrant scheme

Like many municipalities, Kendleton derived substantial revenue from issuing traffic tickets. In Texas, however, municipalities of under 5,000 inhabitants are limited,

with some exceptions, to deriving only thirty percent of their revenue from fines collected from violations of state highway law. TEX. TRANSP. CODE ANN. § 542.402(b). Any additional fines must be sent, less one dollar, to the state of Texas. *Id.* Over time, Kendleton became indebted to the state due to its failure to follow this provision. By May of 2000, Kendleton owed the state approximately $500,000 in unremitted excess fines and associated court costs.

In April of 2000, members of the Kendleton City Council became concerned about this shortfall and sent a letter to Texas Ranger Jeff Cook, requesting that he investigate the KPD. In the letter, the councilmembers explained their concern that ticket revenue was being collected and not forwarded to the state, causing the city to fall deeper into debt. Specifically, the letter suggested that the KPD was collecting cash in satisfaction of fines. Cook investigated these allegations by interviewing former and present Kendleton officers and reviewing the department's bank records; he concluded from this investigation that "there were some general standard practices being used in Kendleton that [he] had never seen before." Cook explained that in other municipalities, if a person did not pay his or her traffic fine, the court would issue a warrant and send it to the police department to serve, but the money collected following the issuance of the warrant would go directly to the municipal court. By contrast, the KPD would issue the warrant itself, stamp it with a judge's signature, and then attempt to collect it. Once an officer collected the money, it would be deposited into the department's bank account. Cook stated that this procedure was unique to Kendleton.

On May 8, 2000, Cook executed a search warrant for the city's offices and the KPD, which occupied a single building in Kendleton. The search recovered the KPD's "warrant transaction sheets," which were used to record fines paid to the department in satisfaction of warrants. Cook compared the names on the sheets with the names of individuals whose checks and money orders were deposited into the department's bank account, and discovered a "big anomaly" between the lists of names. Cook concluded that the department was accepting payment in cash, checks, or money orders, but only depositing the checks and money orders to the account. The warrant transaction sheets only reflected the amounts paid in cash to the department. Cook also noted numerous money orders in very small amounts, as little as one dollar, deposited into the department's account. He concluded that in order to make the cash total on the transaction sheet equal to the amount deposited into the bank account, the department would purchase these small money orders to make it look as if the amounts paid to the department were all being deposited.

Cook noted a second anomaly with the KPD's bank account, which was that it was used to pay the salaries of the officers, as well as the department's operating costs. He stated this was unusual because most municipalities have a single budget that covers all departments, so the police department would not be as directly self-financed as Kendleton's. Once Cook identified this "theft scheme," he alerted an FBI agent to his conclusions.

The warrant division of the KPD was run by Gerald Davis, who was in charge of all the warrants issued by the department, as well as all money received to pay the

warrants. Davis would collect the fines and also make the concurrent bank deposits. During Cook's investigation, he spoke with Davis about the operations of the warrants division, and Davis indicated that the department only accepted cash payments under extraordinary circumstances, and the department had a policy, instituted by Mann, that forbade the acceptance of cash. Davis's testimony, recounted below, revealed this statement to be false. Davis was the critical witness against Mann at trial where he testified that he was "very close" with Mann and that Mann was like a "father figure" to him. Davis explained that the scheme began one day when a check from a Western Union wire transfer arrived at the KPD in Davis's name.[1] Davis alerted Mann, who instructed Davis to cash the check. Davis did so, and Mann told Davis to give him the money. Davis did this as well. Mann told Davis that he intended to keep the money and instructed Davis to "do the switchout." Davis had to ask what that meant, and Mann explained that he was to switch the name of someone who paid cash with the name of the sender of the Western Union order. Mann told Davis that the cash was going to be for a "separate account," and so Davis gave Mann deposit slips and warrant jackets to accompany the payments. Eventually, Mann instructed Davis to destroy the warrant jackets that accompanied some of the payments "to keep anyone from figuring out what happened." Thereafter, Davis destroyed the jackets by burning them in the barbeque pit at his house and ceased providing the supporting paperwork to Mann.

---

[1] Davis was not sure when he and Mann began stealing the cash from the department, but he believed that it began in 1997 or 1998.

Davis explained that he then began holding checks and money orders until he collected an equivalent amount of cash, then depositing the checks and money orders but noting only the cash payments on the warrant transaction sheets. Davis would also purchase the low-value money orders necessary to make up any discrepancy between the amount recorded on the warrant transaction sheets and the amount deposited. Davis testified that Mann had instructed him to do all of these things and had initially given Davis the cash to purchase the money orders.

Davis reviewed a number of warrant transaction sheets he prepared and explained this process to the jury in great detail. He also stated that he "had to try to mislead" city councilmembers, the department's bookkeepers, or anyone with questions about the KPD's finances. To this end, he maintained two sets of receipt books, one of which was a "dummy book" from which he would give receipts to those who paid by check or money order; Davis would destroy this book once all of its receipts had been issued. Mann would retain the "legitimate" receipt books in his office once Davis filled them.

Davis instructed several different officers of the KPD warrants division to go to the homes of people who had received warrants and collect cash from them. These officers would give him the cash at his home, their homes, the police department, or Club Uptown, which was owned by Mann.[2] Mann would periodically ask Davis how much cash he had

[2] Evidence was presented at trial that Mann opened several bank accounts during this time, and he made deposits into them that were out of line with his salary from the KPD. He argued that the money came from the two local bars he owned, but sales tax receipts from those bars suggested that this was highly unlikely.

collected, and Davis would then turn the money over to Mann, who would give Davis some portion of it to keep for himself. Davis testified that this activity continued even after Mann had left the police department following his termination as police commissioner—Davis would meet Mann at his home or club and the two would divide the cash. Davis testified that on a few occasions, he kept all of the cash for himself. On one occasion, Davis directly paid the collecting officer, A.J. Frank, with the cash he had collected per an instruction from Mann.[3] According to Davis, Mann observed him collecting cash "several times." Davis also testified that Mann typed checks drawing on the KPD account two or three times per week.

## B.    The COPS scheme

During Mann's tenure as police commissioner, Kendleton applied for a grant from the federally-funded Community Oriented Policing Services ("COPS") universal hiring program. The application was signed by Mann, as Kendleton's top law enforcement executive, and Jones, as Kendleton's top government executive. Mann and Jones also signed a certification indicating that the information provided on the application was true. The application form made it clear that COPS grant money could only be used for "new officer positions." The application requested funding for six additional full-time police officers in 1997, three more in 1998, three more in 1999, and one more in 2000. The application also stated that the current entry level salary for a Kendleton police officer was

---

[3] According to Davis, officers routinely received a "fee" for collecting on a warrant, with the fee coming out of the collected amount. In the instance discussed above, Officer Frank sought an advance on his paycheck.

$18,500 per year, plus $4,440 in benefits. The grant application was accepted, and the COPS program awarded Kendleton a grant of $318,171 to be used over time to partially fund the salaries of six additional full-time entry-level officers. Mann and Jones signed the document accepting the award on May 1, 1998. The acceptance document repeated the proviso that the funds "must be used to hire one or more new, additional career law enforcement officers . . . . Unless authorized in writing by the COPS office, grant funds may not be applied to the salary or benefits of an officer hired by a grantee prior to the award start date."

Ronald Waddell, a retired former employee of the Department of Justice's Office of the Inspector General ("OIG"), testified that as part of his job he monitored audits of the recipients of COPS grants. At some point, Waddell oversaw an audit of Kendleton's COPS grant that turned up substantial irregularities, causing him to turn the matter over to the investigations division of the OIG. Waddell explained that COPS universal hiring program money may only be used to hire additional entry-level officers, not to fund the salaries or benefits of officers already on the grantee's payroll. He testified that at the time the application was filed, Kendleton did not pay any health benefits to its officers, contrary to what was stated on the grant application. Moreover, Kendleton paid its entry-level officers just $10,000 per year, much less than the application stated. Waddell explained that the award start date was May 1, 1998, and so all officers receiving COPS money had to be hired after that date. Shortly after the award start date, the City of Kendleton began drawing $4,684 dollars out of the available COPS money every couple of weeks until the

payments were stopped in May of 2000. The money, a total of $213,297, was wired from a federal reserve bank in New Jersey to Kendleton's bank in Texas.

Waddell described the first annual report to COPS submitted by Kendleton, also signed by Mann. The report was intended to describe how Kendleton spent the COPS grant money allocated during 1998. The report contained numerous misrepresentations. For example, it stated that the officer with Badge No. 801, for whom COPS money was allocated, was newly hired on June 11, 1998. Badge No. 801 was Mann's badge. Similar information was filled in for Officers Bruce Jackson, Darryl Smith, Gerald Davis, Rene Becerra, and Michael Davis.[4] Waddell testified that he had analyzed payroll information for Kendleton and found that all of these officers were on the payroll prior to the issuance of the COPS grant.

At the close of trial, the jury convicted Mann of all 52 counts against him. Specifically, it found him guilty of conspiracy to violate federal law, in violation of 18 U.S.C. § 371, eight counts of interference with commerce by threats or violence (Hobbs Act extortion), in violation of 18 U.S.C. § 1951, and 43 counts of wire fraud, in violation of 18 U.S.C. § 1343. The trial judge then granted Mann's motion to enter a judgment of acquittal on two of the violations of 18 U.S.C. § 1951. At sentencing, the judge applied a two-level enhancement for obstruction of justice based on the false testimony Mann gave at trial, a two-level enhancement for Mann having committed more than one extortion, an eight-

---

[4] The officers were all identified by their badge numbers. Waddell testified that despite requests by the OIG, Mann never provided the names of the officers receiving COPS money. Waddell managed to identify the other officers using public records.

level enhancement because Mann held a high-level decision-making position, and a four-level enhancement because the criminal activity was extensive. The judge also rejected Mann's challenge to the amount of restitution recommended in the PSI and imposed restitution of $177,634.57 for the amount lost to Kendleton from the warrant scheme[5] and $213,297 for the amount transferred to Kendleton under the COPS program.

Mann challenges the sufficiency of the evidence as to all of his convictions. He also challenges the enhancements to his sentence and the restitution ordered by the district court.

## II. STANDARD OF REVIEW

"In determining whether there was sufficient evidence to sustain [the] convictions, we must decide, viewing the evidence and the inferences therefrom in the light most favorable to the verdict, whether a rational juror could have found [the defendant] guilty beyond a reasonable doubt." *United States v. Anderson*, 174 F.3d 515, 522 (5th Cir. 1999) (citing *United States v. Burton*, 126 F.3d 666, 669 (5th Cir. 1997); *United States v. Payne*, 99 F.3d 1273, 1278 (5th Cir. 1996)). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence." *Id.* (quoting *Burton*, 126 F.3d at 669–70). "Moreover, our standard of review does not change if the evidence that sustains the conviction is circumstantial rather than direct." *Id.*

We review the district court's interpretation and application of the Sentencing

---

[5] Mann and Davis were found jointly liable for this amount.

Guidelines de novo. *United States v. Villanueva*, 408 F.3d 193, 202–03 (5th Cir. 2005). We review its factual findings for clear error. *Id.*

## III. DISCUSSION

### A. Sufficiency of the evidence

### (1) Conspiracy

Mann asserts that his conviction for conspiracy to violate federal law was not supported by sufficient evidence. "In order to prove conspiracy pursuant to 18 U.S.C. § 371, the Government must prove (1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Floyd*, 343 F.3d 363, 370 (5th Cir. 2003) (internal quotation omitted). "[A] general guilty verdict on a multiple-object conspiracy charge may stand even if the evidence is insufficient to sustain a conviction on one of the charged objects." *United States v. Calle*, 120 F.3d 43, 45 (5th Cir. 1997). The evidence only needs to be sufficient to support a conviction for one of the charged objects. *Id.*

The indictment charged Mann with conspiring, *inter alia*, to commit mail fraud. "The three elements of conspiracy to commit mail fraud are (1) an agreement between [Mann] and others (2) to commit the crime of mail fraud, and (3) an overt act committed by one of the conspirators in furtherance of that agreement." *United States v. Sneed*, 63 F.3d 381, 385 (5th Cir. 1995) (internal quotation omitted). "To sustain a mail fraud

conviction, the government must prove (1) a scheme to defraud (2) which involves a use of the mails (3) for the purpose of executing the scheme." *United States v. Ingles*, 445 F.3d 830, 835 (5th Cir. 2006); *see also* 18 U.S.C. § 1341. The test to determine whether a defendant caused the mails to be used is whether the use was reasonably foreseeable; the defendant need not intend to cause the mails to be used. *Id.*

As described above, the government presented ample evidence at trial that Davis and Mann conspired to defraud Kendleton of money due to it from individuals who failed to appear in court. Davis testified that Mann instructed him to keep two sets of books in order to hide some of the money and to burn the warrant jackets associated with certain payments. Further, Davis testified that many of the checks and money orders arrived by mail, and Davis would mail receipts back to the individuals, which was part of the ordinary way in which warrants were processed. It was thus reasonably foreseeable to Mann that the mails would be used for the purpose of executing the scheme at the time it was concocted. We thus find that sufficient evidence supports Mann's conviction for conspiracy to violate federal law.

## (2) Wire fraud

Mann asserts that his convictions for wire fraud were not supported by sufficient evidence. "Wire fraud is (1) the formation of a scheme or artifice to defraud, and (2) use of the wires in furtherance of the scheme." *United States v. Brown*, 459 F.3d 509, 518 (5th Cir. 2006). "Violation of the wire-fraud statute requires the specific intent to defraud, i.e., a conscious knowing intent to defraud." *Id.* at 519 (internal quotation omitted).

Mann's wire fraud convictions stemmed from the 43 wire transfers of money from the United States Treasury to Kendleton's bank account. Testimony at trial established that Mann formed a scheme to use the COPS grant for an improper purpose, including self-enrichment. *See United States v. Powers*, 168 F. 3d 741, 746 (5th Cir. 1999) ("An intent to defraud for the purpose of personal gain satisfies the 'harm' requirement of the wire fraud statute.").

Though Mann's defense was that he simply did not understand the rules of the COPS program, and thus had no intent to defraud, the application he submitted indicated that Kendleton intended to hire new officers with the COPS money. Because he never hired any new officers and instead used the money to increase salaries and benefits of officers already on the payroll, the jury could infer that he had an intent to defraud when he submitted the application. Use of the wires in furtherance of the scheme was demonstrated by the transfers themselves. This use was reasonably foreseeable to Mann, though he had no role in establishing the bank account, because money is commonly paid over long distances by means of wire transfer. *See, e.g., United States v. Richards*, 204 F.3d 177, 207–08 (5th Cir. 2000), overruled on other grounds by *United States v. Cotton*, 535 U.S. 625, 631 (2002). The jury had sufficient evidence to convict Mann on these counts.[6]

(3)    Hobbs Act convictions

---

[6] Mann also argues that the jury could not have convicted him on aiding and abetting wire fraud, an alternative charge under counts 10 to 43 of the indictment. Because we conclude that the jury had sufficient evidence to convict him on commission of wire fraud, we need not reach this argument.

Mann asserts that his convictions under the Hobbs Act, 18 U.S.C. § 1951, were not supported by sufficient evidence because the government failed to prove that his alleged acts interfered with interstate commerce, which is a required element for conviction under the Hobbs Act.

Mann's argument on this point is not perfectly briefed. With regard to each of the Hobbs Act convictions, he offers a sentence noting that little evidence was presented about the origins or destinations of the ticketed travelers or the effect that ticketing them had on interstate commerce. Standing alone, these perfunctory arguments would probably be insufficient to preserve the issue for review. *See United States v. Green*, 964 F.2d 365, 371 (5th Cir. 1992). However, Mann also challenges whether his convictions under the Hobbs Act amounted to an unconstitutional application of the Commerce Clause. In his discussion of that issue, he refers specifically to the "jurisdictional element" of the Hobbs Act and cites *United States v. Box*, 50 F.3d 345 (5th Cir. 1995), discussed *infra*, to support his argument that his convictions under the Hobbs Act are unconstitutional because no evidence of an effect on interstate commerce was shown.[7] Although inartfully pleaded, Mann's brief does raise the issue of the sufficiency of the evidence for our consideration. Despite his conflation of the evidentiary and constitutional questions, we will evaluate his arguments.[8]

---

[7] The first sentence of Mann's brief reads, "[p]roving that interstate commerce has been affected is critical because federal jurisdiction rests on that basis."

[8] This conflation is somewhat understandable in light of Fifth Circuit precedent—at least one panel of this circuit has dispensed with both questions in a single analysis. *See*

The Hobbs Act punishes "[w]ho[m]ever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion." 18 U.S.C. § 1951(a). The term "commerce" as defined by the statute means, *inter alia*, "all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof." *Id.* § 1951(b)(3). A Hobbs Act prosecution requires the government to prove that the defendant committed, or attempted or conspired to commit, a robbery or act of extortion that caused an interference with interstate commerce. *United States v. Robinson*, 119 F.3d 1205, 1212 (5th Cir. 1997). In this instance, sufficient evidence must indicate that each alleged violation of the Hobbs Act (i.e., each driver who was pulled over and ultimately extorted) resulted in some interference with interstate commerce. *See United States v. Diaz*, 248 F.3d 1065, 1084 (11th Cir. 2001) ("Unlike a conspiracy charged under the Hobbs Act, which only requires proof that defendants' scheme *would have* affected interstate commerce, a substantive Hobbs Act violation requires an actual effect on interstate commerce.").

This circuit's caselaw is consistent on this point. In *Robinson*, we noted that "[e]very robbery or act of extortion in violation of the Hobbs Act must have an effect on interstate commerce; the Act's express jurisdictional element ensures this." 119 F.3d at 1215. In *United States v. Jennings*, 195 F.3d 795, 802 (5th Cir. 1999), we affirmed the defendant's conviction for attempted interference with interstate commerce in violation of the Hobbs Act only after finding that a successful completion of his scheme "would

*United States v. Villafranca*, 260 F.3d 374, 377 (5th Cir. 2001).

have . . . curtailed interstate purchases." 195 F.3d at 802. We have refused to affirm convictions under the Hobbs Act when the government failed to prove that the defendant's acts had an effect on interstate commerce, which is necessarily more difficult to show when the victim of the crime is an individual and not a business. *See Box*, 50 F.3d at 352; *United States v. Collins*, 40 F.3d 95, 100–01 (5th Cir. 1994).

In *Box*, the defendants were convicted, *inter alia*, of both (1) conspiracy to extort in violation of the Hobbs Act and (2) several substantive counts of extortion under the Hobbs Act, stemming from a scheme in which they extorted money from travelers they arrested for indecent exposure at a roadside park. 50 F.3d at 348. Two defendants challenged these convictions and asserted that the government had failed to prove that their conduct affected interstate commerce. *Id.* The court noted that while proving an effect on interstate commerce is critical, "the effect on commerce need only be slight" to support a conviction. *Id.* at 352. The court noted that evidence at trial showed that many of the arrested travelers were from other states or traveling to them, that the highway on which the rest area was located, U.S. Highway 287, "provided access to other highways leading to other states," and that the roadside park was specifically constructed to facilitate interstate travel. *Id.* The court upheld the defendants' conspiracy convictions based on this evidence. *Id.*

*Box* demonstrates that a generalized connection between the alleged criminal activity and interstate commerce is sufficient to sustain a conviction for *conspiracy* to violate the Hobbs Act. However, substantive convictions under the Hobbs Act require that

the alleged act actually have an effect on interstate commerce. The court in *Box* noted that in order to sustain each substantive conviction under the Hobbs Act, it needed to "make a closer examination of the evidence." *Id.* It found that in regard to three of the counts, because the victims "were Texas residents and traveling within the state, there has been no showing that interstate commerce was affected." *Id.* It held that the location of the roadside park, by itself, was not sufficient to satisfy the interstate commerce requirement. *Id.* It reversed these convictions for insufficient evidence. *Id.* By contrast, the court upheld the defendants' convictions with respect to travelers proven to have been engaged in interstate travel at the time of the arrest. *Id.* The facts and analysis in *Box* demonstrate that the government has the burden to show that each underlying count had an effect on interstate commerce, beyond the mere use of a highway connecting to the interstate system as the location of the extortion.[9]

Of the six contested counts against Mann under the Hobbs Act, the government only provided evidence that one of the travelers (Raul Salazar, named in count 3) who was victimized by the extortion scheme was traveling to or from a point outside of Texas.[10] The

---

[9] *Box* has been cited approvingly in Hobbs Act cases following *United States v. Lopez*, 514 U.S. 549 (1995), and its holding remains the law in this circuit. *See Villafranca*, 260 F.3d at 377–78 & n.12; *Robinson*, 119 F.3d at 1212. The dissent questions our reliance on *Box* by suggesting that *Lopez* somehow broadened this circuit's interpretation of Congress's Commerce Clause powers, such that *Box* is no longer good law. However, *Box* itself was cited as recently as 2001 for reflecting our historically "expansive application of the government's commerce power in the Hobbs Act context." *Villafranca*, 260 F.3d at 378 n.12.

[10] Salazar testified that when he received his ticket he was traveling from Mexico to Atlanta, Georgia. He missed his court date, and when his daughter called the KPD she

traveler named in Count 2, Phyllis McIver Dowlin, did not testify as to her origin or destination on the day she was stopped by the KPD. The traveler named in Count 4, Wanda Mitchell, testified that when she received a citation for speeding from the KPD, she was traveling from Houston to "San Antone." No further evidence was presented about her destination. The travelers named in Counts 7, 8, and 9, Linda Sedillo, Edith Salinas, and Gloria Drayton, did not offer any testimony about their origins or destinations at the time they were pulled over.[11]

The government asserts that the other convictions may be sustained because: (1) Highway 59 is used by a number of travelers who are engaged in interstate trips; (2) the travelers here would not have stopped unless they were pulled over, unlike the travelers in *Box* who had stopped at the rest area on their own; (3) the scope of the activities was "pervasive" and thus affected a number of interstate drivers; and (4) federal funds were used to pay the salaries of the arresting officers.

The first argument is unpersuasive, since it does not speak to the facts of any of the individual offenses. The government's second argument also fails, because it was the

---

was told to wire $537, payable to Gerald Davis, to satisfy the fine. He did so, but he testified that he would not have paid the fine if he had known that it was going into someone's pocket, and not to the city of Kendleton. The docket sheet did not reflect any disposition of his ticket. Mann contends that Salazar was never threatened with arrest or use of force, but no threat or force need be proved when the defendant is a public officer. *United States v. Westmoreland*, 841 F.2d 572, 581 (5th Cir. 1988).

[11] A number of other travelers who had been issued warrants by the KPD testifed as well, though their experiences were used to support the overt acts portion of the conspiracy charge against Mann.

destination of the travelers themselves that sustained the convictions in *Box*, not the place of their arrest or the amount of inconvenience they suffered. The third argument also does not speak to the individual acts charged. The government's fourth argument misunderstands the nature of the inquiry—each Hobbs Act violation must cause interference with interstate commerce; it is not sufficient to show that interstate commerce was somehow implicated in the course of events. *See, e.g., United States v. Davis*, 707 F.2d 880, 881–84 (6th Cir. 1983) (holding that a sheriff interfered with interstate commerce because he coerced his deputies into diverting federal funds into his election campaign coffers). Because the government failed to prove a substantial effect on interstate commerce in counts 2, 4, 7, 8, and 9, we must reverse these convictions.

Mann asserts that count 3 should also be reversed, despite the fact that Salazar was traveling interstate when he was stopped, because the government never proved that Mann himself extorted Salazar. The evidence described *supra* indicates that Davis acted according to Mann's instructions regarding their scheme when he told Salazar's daughter that Salazar needed to send a money order made out in Davis's name to satisfy Salazar's outstanding warrant. We affirm this conviction.

B.    Constitutionality of the Hobbs Act convictions

Mann asserts that his convictions under the Hobbs Act were unconstitutional because the government failed to prove that his conduct had a nexus with interstate commerce. Having vacated all but one of Mann's Hobbs Act convictions, we need only examine this argument with respect to Count 3, in which the government proved that the

traveler in question was headed from Mexico to Georgia. Mann agrees that Congress has the power to prohibit activities that have a deleterious effect on interstate commerce, but he asserts that stopping an interstate traveler and extorting money under color of official right would lie outside of Congress's powers under the Commerce Clause. This argument directly contradicts the holding in *Box*, discussed *supra*, and is thus unavailing.

## C.  Challenges to sentencing

Mann was sentenced under the 1998 version of the Sentencing Guidelines. The district court assigned Mann a base offense level of 10 and a criminal history category of I. It then enhanced Mann's offense level pursuant to four different sections of the guidelines. Mann's adjusted offense level was 26, yielding a guideline range of 63 to 78 months of imprisonment. The district court sentenced Mann to 60 months imprisonment on the conspiracy and wire fraud charges (counts 1 and 10 through 52) and 63 months imprisonment on counts 2 through 4 and 7 through 9, terms to be served concurrently. The district court also imposed restitution of $390,931.57. Mann challenges the sentencing enhancements and the restitution determination.

### (1)  Enhancement under U.S.S.G. § 2C1.1(b)(1)

The district court increased Mann's offense level by two because it found that Mann's offenses involved more than one extortion "based upon the evidence at trial." *See* U.S.S.G. § 2C1.1(b)(1) ("If the offense involved more than one bribe or extortion, increase by 2 levels."). Mann contends that because the evidence did not support these convictions, this enhancement was erroneous. The "offense" referred to in section 2C1.1(b)(1) includes

"the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1 cmt. n.1(I). "Relevant conduct includes offenses that are part of the same course of conduct or common scheme or plan as the offense of conviction." *United States v. Brummett*, 355 F.3d 343, 344 (5th Cir. 2003). A district court's determination of what constitutes relevant conduct is reviewed for clear error. *United States v. Solis*, 299 F.3d 420, 461 (5th Cir. 2002).

While we have reversed his convictions for several of the extortionate acts, this does not remove those acts from the universe of relevant conduct. "A district court may consider non-adjudicated offenses (offenses for which the defendant has neither been charged nor convicted) that occur after the offense of conviction, provided they constitute 'relevant conduct' under U.S.S.G. § 1B1.3." *Brummett*, 355 F.3d at 344. The extortions of the non-interstate travelers, which were proven by a preponderance of the evidence, as well as the testimony of Davis as to the overall scheme to extort, was sufficient to support a finding that Mann participated in more than one extortionate act. The district court did not err in applying this enhancement.

## (2) Enhancement under U.S.S.G. § 2C1.1(b)(2)(B)

The district court applied an eight-level enhancement because the "offense involved a payment for the purpose of influencing . . . any official holding a high-level decision-making or sensitive position." *See* U.S.S.G. § 2C1.1(b)(2)(B). Mann's position as police commissioner of the KPD made him an "official holding a high-level decision-making or

sensitive position." *Id.* § 2C1.1(b)(2)(B) cmt. n.1. Mann asserts that the purpose of the enhancement is to punish the person who makes the payment, rather than the recipient of the payment, but there is no support for this position in the language of the guidelines and it is controverted by caselaw. *See United States v. Villafranca*, 260 F.3d 374, 381 (5th Cir. 2001) ("The Guideline does not require that the defendant have paid the money to the decisionmaking official; instead, it merely requires that the offense involve a payment to such an official."). Further, the evidence indicated that Mann received extorted payments for the purpose of influencing his management of the KPD's finances and recordkeeping system. We find that the district court did not err in applying this enhancement.

### (3)   Enhancement under U.S.S.G. § 3B1.1(a)

The district court enhanced Mann's sentence by four levels because it determined that he was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Mann asserts that his scheme, which involved numerous officers of the KPD who collected warrant payments and passed them along to Mann through Davis, was not "otherwise extensive." We disagree. Moreover, the mayor of Kendleton and other city employees were involved (some innocently) in the scheme to defraud the COPS program. The comments to section 3B1.1(a) make it clear that the district court could consider, for the purposes of applying the enhancement, all of the persons implicated in carrying out the offenses, including those who did so unknowingly. *See* U.S.S.G. § 3B1.1(a) cmt. n.3. The enhancement was not erroneously applied.

### (4)    Enhancement under U.S.S.G. § 3C1.1

The district court applied a two-level enhancement for obstruction of justice, due to Mann's various untruthful statements during the investigation and trial. *See* U.S.S.G. § 3C1.1 (providing for a two-level increase if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction"). Obstruction of justice includes "committing . . . perjury" and "providing materially false information to a judge." *Id.* at cmt. n. 4(b), (f). For an obstruction of justice enhancement, the district court's factual findings are reviewed for clear error. *See United States v. Holmes*, 406 F.3d 337, 363 (5th Cir. 2005).

Mann testified at trial that he did not know that COPS grant money could not be used to increase the salaries of officers already on the payroll. Considering the evidence that Mann deliberately attempted to mislead the government into believing that he had in fact hired new officers with the money, the district court justifiably found this statement to be false and perjurious. Further, this statement was material to the charges of wire fraud because the wire fraud hinged on knowingly using the COPS grant for a forbidden purpose. The district court did not clearly err in applying the enhancement.

### (5)    Restitution

The district court ordered Mann to pay $390,931.57 in restitution. We review the legality of such awards de novo, and if the award is legally permitted we review the amount for abuse of discretion. *See United States v. Cothran*, 302 F.3d 279, 288 (5th Cir.

2002). Restitution may be required for losses deriving from the scheme, conspiracy, or pattern of the offense of conviction. *United States v. Love*, 431 F.3d 477, 480 (5th Cir. 2005). When a defendant has been convicted of participating in a scheme to defraud, "the district court's inclusion of all losses caused by the scheme" is appropriate for calculating restitution. *United States v. Pepper*, 51 F.3d 469, 473 (5th Cir. 1995).

At trial, Susan Ridley, a financial analyst with the FBI, testified that Kendleton lost $177,634.57 due to the actions of Mann and Davis during the course of their scheme to steal money intended to pay outstanding warrants. Counts 10 through 52 identify a total loss of $180,506.98 to the federal COPS grant program. Waddell, an auditor with the DOJ, testified that Kendleton received a total of $213,297 under the COPS grant. This loss was caused by Mann's deliberate misstatements to the DOJ in the grant application and subsequent progress reports. Though Mann asserts that he should only be held liable for the amounts proved in the counts for which he was convicted, our caselaw does not support this position. We hold that the district court did not abuse its discretion in determining the amount of restitution.

## IV. CONCLUSION

For the foregoing reasons, we REVERSE Mann's convictions on counts 2,4,7,8, and 9. All other convictions and Mann's sentence are AFFIRMED.

WIENER, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's opinion in all respects, except for Section III.A.(3) — the section that reverses all but one of Mann's Hobbs Act convictions. As to those reversals, I respectfully dissent because I disagree with (1) the majority's willingness to characterize Mann's challenge as one of insufficient evidence of interstate nexus to support the convictions on Counts 2, 4, and 7-9, and (2) the majority's reliance on United States v. Box[1] to conclude that there was insufficient evidence of an effect on interstate commerce.[2]

---

[1] 50 F.3d 345 (5th Cir. 1995).

[2] To me, the panel majority erroneously characterizes Mann's challenge as one to the insufficiency of the evidence. Actually, Mann's brief makes pellucid that he makes only a unconstitutional-as-applied challenge to his Hobbs Act convictions. Moreover, even if Mann had couched his challenge in evidentiary terms, it still would be properly cognizable as a constitutional challenge. Mann does not contend that the government failed to offer evidence of an effect on interstate commerce; only that the evidence offered by the government was constitutionally insufficient, as applied, to support a Hobbs Act conviction, because it did not demonstrate an adequate interstate nexus.

The panel majority has essentially conceded this point, acknowledging that "[s]tanding alone, these perfunctory arguments would be insufficient to preserve the issue for review." Instead of stopping there as it should have, the panel majority goes on in the next three sentences to conclude that, because Mann has adequately raised a completely separate, unconstitutional-as-applied challenge to his convictions (which I agree he has), he has also adequately raised an insufficiency-of-the-evidence argument (which I conclude he has not). I am puzzled by the majority's legerdemain here. As far as I know, this court has always maintained a strong policy against "lawyering" a party's case for him. Part and parcel of this policy is that a litigant who fails to raise or brief an issue is deemed to have waived or abandoned it. Thus, I am unaware of any principle of this court that

- 25 -

As the majority notes, the defendants in Box were charged with and convicted for numerous acts of extortion against individuals at a rest area abutting a U.S. Highway.  The Box panel affirmed some convictions and reversed others, based on whether the individual victim in each count was traveling interstate or purely intrastate at the time of the defendants' extortion.  Specifically, three convictions were affirmed, one because the victim was traveling from Texas to Oklahoma, another because the victim was traveling from Texas to Colorado and New Mexico, and the third because the victim was traveling from Colorado to Oklahoma.  Three other convictions were reversed, however, because each victim was traveling from one location in Texas to another.  In like manner, the panel majority today reverses all but one of Mann's Hobbs Act convictions (the one in which the victim was traveling from Mexico to Georgia), because the government failed to introduce evidence that the victims in the remaining counts were traveling interstate, only that they were traveling on a U.S. Highway.

If Box were still good law, I could not fault my colleagues for that result.  But I see reliance on Box as no longer justifiable.  Ever since the Supreme Court

blesses a panel's *sua sponte* cobbling together bits and pieces of a party's disparate arguments to deem a litigant to have conjured up an argument he never made.  It is the party's task, and the party's task alone, to preserve his issues and arguments by sufficiently raising and briefing them.

handed down United States v. Lopez,[3] we have applied its "aggregation doctrine" — and rightly so — when determining whether an act of extortion under a Hobbs Act charge has a substantial effect on interstate commerce.[4] I read Box as an outlier for its failure to acknowledge or apply this aggregation doctrine in determining whether the extortions at issue there had a substantial effect on interstate commerce. (This is not meant as a criticism of the panel that rendered Box, as it was decided several months before the Supreme Court handed down Lopez with its express embrace of applying the aggregation principle in Commerce Clause cases.) Today's panel majority errs in relying on Box, a single pre-Lopez, pre-aggregation case.[5] Instead, we should, as mandated by Lopez and

---

[3] 514 U.S. 549 (1995).

[4] *United States v. Jennings*, 195 F.3d 795, 799-801 (5th Cir. 1999); *United States v. Robinson*, 119 F.3d 1205, 1214-15 (5th Cir. 1997).

[5] The panel majority erroneously invokes *United States v. Villafranca* to justify reliance on *Box* as the law of this circuit after *Lopez*. 260 F.3d 374, 378 n.12 (5th Cir. 2001). In *Villafranca*, we stated, "[a]lthough *Box* predates the watershed Supreme Court decision in *United States v. Lopez*, this circuit has reaffirmed the *expansive application* of the government's commerce power in the Hobbs Act context and related criminal law contexts." *Id.* at 378 n.12 (internal citations omitted and emphasis added). The majority mistakenly takes this statement to mean that *Box* is still good law. The panel majority, however, has missed or disregarded the context of this statement.

First, the *Villafranca* court's statement was only directed to *Box*'s treatment of the defendants' Hobbs Act *conspiracy* convictions. It had no bearing on *Box*'s handling of the defendants' substantive Hobbs Act convictions. Here, only the disposition of Mann's substantive Hobbs Act convictions are in dispute. Thus, *Villafranca*'s discussion of *Box* is inapposite.

Even more significantly, the *Villafranca* statement acknowledges that, both pre- and post-*Lopez*, this court has applied an *expansive* view of the government's commerce

- 27 -

our own post-Lopez caselaw, analyze the facts of the subject case in light of a Commerce Clause challenge by determining whether Mann's extortionate acts, if repeated in the aggregate across the nation, would have a substantial effect on interstate commerce.  When that is done, I find the conclusion inescapable that, if small town police departments and rural sheriff offices all across the country were to take U.S. Highways hostage with extortionate schemes and acts like Mann's, there absolutely would be a substantial effect on interstate commerce.  We do not need some Daubert-qualified expert to testify in support of the government's position or to underpin the obvious answer that interstate commerce would be substantially affected by such an aggregation.  To me, this conclusion is wholly unavoidable: I would affirm all of Mann's Hobbs Act convictions after applying the methodology mandated by Lopez.

In closing, I note in the alternative that my position is also consistent with the Supreme Court's acknowledgment in Lopez that Congress may regulate the use of the channels of interstate commerce by keeping them free from immoral

---

power.  In *Box*, three substantive Hobbs Act convictions were reversed as being beyond the government's commerce power.  The panel majority cannot contend that the *Villafranca* statement acknowledging this court's expansive treatment of the government's commerce power reaffirms the post-*Lopez* viability of a case that *narrowed* the government's commerce power.  Moreover, the *Villafranca* statement acknowledging our expansive application of the government's commerce power is completely averse to what the panel majority does today — narrow the government's commerce power.

and injurious uses.[6]  It cannot be debated that U.S. Highway 59, which has spanned this country's midsection from Canada to Mexico since 1934, is a channel of interstate commerce.  This is an independent reason why I cannot see how the majority can conclude that Congress is without authority to punish Mann's "highway robbery" — an obvious malignant use of our interstate highway system.

For these reasons, I must respectfully dissent from the majority's reversal of Counts 2, 4, and 7-9.

---

[6] 514 U.S. at 558.