# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 24, 2022

Lyle W. Cayce
Clerk

No. 21-50380
Summary Calendar

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

BRADLEY LANE CROFT,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:18-CR-603-1

Before KING, COSTA, and HO, *Circuit Judges*.

PER CURIAM:[*]

Bradley Lane Croft challenges the sufficiency of the evidence supporting his convictions for wire fraud, aggravated identity theft, and money laundering. He also challenges the restitution and forfeiture orders

---

[*] Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

No. 21-50380

issued by the district court pursuant to those convictions. For the following reasons, we AFFIRM.

## I. FACTS AND PROCEDURAL HISTORY

From 2011 to 2018, Bradley Lane Croft was the operator of Universal K-9, a school in San Antonio that trained dogs, as well as handlers, for various law-enforcement related tasks such as detection and tracking.  Initially, many of Croft's students came from small police departments; he would both train a person as a handler and then provide him or her with a dog (often obtained from shelters) for $2,500, well below the normal price of obtaining a working dog even before considering the price of training. Croft then thought of a new approach to expand his business: teaching veterans who could pay the course fee using funds provided through the G.I. Bill and paid by the Education Benefits Program of the Department of Veterans Affairs (VA). To be eligible to receive those funds, Universal K-9 had to be certified by the Texas Veterans Commission (TVC) as a non-accredited, non-college-degree school.

Over the course of three years, Croft submitted multiple applications to the TVC; eventually, after the fourth application (received on March 4, 2016) was approved, Universal K-9 was certified by the TVC and accepted by the VA on June 24, 2016. One of the required attachments for an application for a non-accredited, non-college-degree school was a "Roster of Administrative and Instructional Staff." The form where that information was to be submitted contained a provision where the submitting applicant agreed: "I certify that the information on this form (and/or attachment) is true and correct to the best of my knowledge and belief."

Rufus Coburn, who was the Assistant Director of the TVC when Croft's applications were submitted, testified at trial that the name of the instructors and their certifications to teach the listed classes were required

for approval of an application by the TVC.  He also described the roster as a "particularly important" part of the application. Coburn additionally testified that each individual instructor had to be approved to teach veterans by the TVC, that "the veteran will not be able to get the G.I. Bill benefits if [an] unapproved instructor is one of their instructors," and that the roster of instructors had to be updated if any changes occurred.

On the final application, which was ultimately approved, Croft listed four instructors whose duties were to "[t]each [c]lass and [t]rain [d]ogs": Wes Keeling, Dustin Bragg, Jesse Stanley, and Art Underwood. In the column titled "Course/Subject Taught," each had the following courses listed: Police K-9 Handlers Course, Police K-9 Trainers Course, K-9 Interdiction Course, Behavioral Modification, and Kennel Master Course. Croft's application additionally included numerous certificates detailing the certifications of the four instructors.

However, at trial, evidence was introduced that the four individuals had neither given their permission to be listed as Universal K-9 instructors for the purposes of the TVC application nor actually served as instructors for the listed courses. Wes Keeling testified that he only taught a short interdiction course as a module to Universal K-9's larger program (and only to police officers and not to the general public), stopped teaching for Universal K-9 in 2017, and did not agree to teach the courses listed on the application nor grant permission for Croft to use his name and certifications on the application. Dustin Bragg testified that he had never talked with Croft about joining Universal K-9's staff nor had he authorized use of his name for the application, but instead taught just one-to-two interdiction modules with Keeling (who served as his point of contact and paid Bragg for that work); he did not agree to teach any other courses. Jesse Stanley testified that he had agreed to work with Universal K-9 should it be approved for different military contracts that were separate from and predated the TVC application, ended

No. 21-50380

his working relationship with the company in 2014, and was already employed by the Department of Homeland Security by the time the final application was submitted and approved. The court did not hear testimony from Art Underwood, and for good reason—he was dead, and had been dead since March 16, 2014, approximately two years before Croft filed his final application. Multiple students (including veterans who took classes using G.I. Bill funds) testified that their classes were primarily taught by Croft and/or other individuals not listed on the TVC application.

The court also heard testimony from Richard Cook, who recruited veterans and processed paperwork for Universal K-9 to be paid by the VA. Cook was a 100% disabled veteran who suffered from cognitive disabilities due to injuries he suffered as a result of a random act of violence years earlier. Cook testified that, unbeknownst to him, Croft had listed Cook as the President of Universal K-9 on applications to the TVC. Cook also testified that, at Croft's direction, he opened multiple bank accounts in his own name for Universal K-9 to receive funds from the VA (ultimately totaling $1,506,758.31) and sent the checkbooks, debit cards, and online passwords to Croft.

Croft often directed Cook to withdraw funds from these accounts, and sometimes to funnel those funds through Cook's own bank accounts, which Croft then used to make several purchases. These purchases were either made with the hope to expand Universal K-9 and its activities with veterans or for Croft's own benefit. These purchases included an American Eagle 45T mobile home, a property at 15329 Tradesman in San Antonio, multiple pickup trucks held in the name of other people (including Croft's daughter), payment for elective surgery, and jet skis. For some of these purchases, Croft had Cook withdraw money from the Universal K-9 accounts holding VA money in intervals of $9,000 or less, under the threshold where reporting is required by the financial institution.

No. 21-50380

In a superseding indictment, Croft was charged with eight counts of wire fraud in violation of 18 U.S.C. § 1343, four counts of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1), two separate counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A), (a)(1)(B), and (a)(2), and two counts of making a false tax return in violation of 26 U.S.C. § 7206(1). After a bench trial, Croft was found guilty on all counts. He was ultimately sentenced to 118 months' imprisonment. The court also ordered that Croft pay a $1,600 special assessment and $1,506,758.31 in restitution and ordered forfeiture of several pieces of personal and real property.[1] Croft timely appeals.

## II. DISCUSSION

Croft challenges the sufficiency of the evidence supporting his convictions for wire fraud, aggravated identity theft, and money laundering.[2] He additionally challenges the district court's restitution and forfeiture orders.

We "review[] a district court's finding of guilt after a bench trial to determine whether it is supported by 'any substantial evidence.'" *United States v. Serna-Villarreal*, 352 F.3d 225, 234 (5th Cir. 2003) (quoting *United States v. Shelton*, 325 F.3d 553, 557 (5th Cir. 2003)). That is, we look to see whether "any rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt." *Id.* In doing so, we cast the evidence "in the light most favorable to the verdict," *id.*, and "defer to all reasonable inferences drawn by the trial court," *United States v. Turner*, 319

---

[1] The specific forfeiture was: a mobile home; two pickup trucks; two jetskis; a trailer; multiple specific amounts of currency seized from Universal K-9's bank accounts; the property at 15329 Tradesman, San Antonio; and a money judgment equal to $1,300,000 representing the value of traceable proceeds.

[2] He does not challenge his convictions for making false tax returns.

No. 21-50380

F.3d 716, 721 (5th Cir. 2003) (quoting *United States v. Mathes*, 151 F.3d 251, 252 (5th Cir. 1998)). We will take each challenged conviction in turn.

## A. Wire Fraud

Proving wire fraud requires proving the following elements: "(1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud." *United States v. Harris*, 821 F.3d 589, 598 (5th Cir. 2016). "'Scheme to defraud' is tricky to define, 'but it includes any false or fraudulent pretenses or representations intended to deceive others in order to obtain something of value, such as money, from the [entity] to be deceived.'" *United States v. Swenson*, 25 F.4th 309, 316–17 (5th Cir. 2022) (alteration in original) (quoting *United States v. Evans*, 892 F.3d 692, 711–12 (5th Cir. 2018)). The false statement or pretense must also be material, meaning that "it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Harris*, 821 F.3d at 599 (alteration in original) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). Lastly, the intent element requires that the defendant "acts knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to himself." *Swenson*, 25 F.4th at 318–19 (quoting *Evans*, 892 F.3d at 712).

The use of the wires is not in dispute—Croft's successful application for Universal K-9 to be certified by the TVC led more than a million dollars of G.I. Bill funds to be transported through the wires and into his coffers. The only question, then, is whether that certification was procured through fraud. We agree that there was sufficient evidence to that effect.

First, looking to the scheme, there was sufficient evidence that Croft falsely listed four individuals on his application as instructors who did not, and would not, serve in that role. The court heard ample testimony to that

6

effect from many of the individuals themselves. And it beggars belief that Croft, when filling out his application, had Art Underwood's agreement to train and instruct dog handlers from beyond the grave. Sufficient evidence supported finding false representations, and material false representations at that: Rufus Coburn testified to the importance of the roster of instructors to the application, and that an application without an accurate list of certified instructors would be denied.

Further, to the extent any of the four were previously involved with Universal K-9, taught some classes overlapping with veterans attending, or even were somewhat involved with the TVC application (as Croft argues), that does not cut against a finding of deceit. The TVC, in approving an application, expected that the listed, certified instructors were teaching the listed classes. They were not. The TVC further expected that it and the VA would be kept abreast of any changes to the roster of instructors. They were not. And the TVC and VA expected that the veterans who were spending their G.I. Bill benefits on classes at Universal K-9 would be taught the specific classes listed on the application by the specific instructors listed on the application. They were not. That is sufficient to find deceit. Any argument that at least one qualified instructor worked for Universal K-9 after certification, and may have even taught some classes to veterans, barks up the wrong tree. The application called for a person to provide, to the best of his or her knowledge, a complete, accurate roster of certified instructors teaching specific classes before an application could be approved. Croft did not provide that, but instead provided a list rife with falsehoods. There was sufficient evidence that these falsehoods were not included by mistake, but instead were designed to deceive. We have previously noted that false representations made to procure a government contract for which a person would not otherwise qualify evidence a scheme to defraud. *See Harris*, 821

F.3d at 598–99. There was sufficient evidence of that here, and, therefore, sufficient evidence to find a scheme to defraud.

There was also sufficient evidence to find a specific intent to defraud. "[P]roof of such intent can arise 'by inference from all of the facts and circumstances surrounding the transactions.'" *United States v. Ismoila*, 100 F.3d 380, 387 (5th Cir. 1996) (quoting *United States v. Keller*, 14 F.3d 1051, 1056 (5th Cir. 1994)). As stated above, there was ample evidence that Croft listed individuals as instructors who had not, would not, and even could not serve in that role. Further evidence arises from the fact that, even after certification, Croft did not even reach out to any of the living individuals to enlist them as the instructors he purported them to be. And even more evidence of intent can be derived from the fact that Croft used VA monies to enrich himself. *See United States v. Stockman*, 947 F.3d 253, 264 (5th Cir. 2020); *United States v. Mann*, 493 F.3d 484, 493 (5th Cir. 2007). There was sufficient evidence to find Croft's intent to defraud, and, therefore, sufficient evidence to support the convictions for wire fraud.

## B. Aggravated Identity Theft

We next turn to Croft's challenge to his conviction for aggravated identity theft. "To establish aggravated identity theft in violation of 18 U.S.C. § 1028A, the Government was required to prove that [Croft] (1) knowingly used (2) the means of identification of another person (3) without lawful authority (4) during and in relation to a felony enumerated in 18 U.S.C. § 1028A(c)." *United States v. Mahmood*, 820 F.3d 177, 187 (5th Cir. 2016). Wire fraud is one of said enumerated offenses, 18 U.S.C. § 1028A(c)(5), and a person's name is considered a means of identification, 28 U.S.C. § 1028(d)(7)(A).

Croft's sole challenge was based on an asserted lack of "use" of the four victim's names. He points to cases from other circuits for support,

principally focusing on *United States v. Miller*, 734 F.3d 530 (6th Cir. 2013). There, the Sixth Circuit held that "as a matter of law, [the defendant] did not 'use' a means of identification within the meaning of § 1028A by signing a document in his own name which falsely stated that [the alleged victims] gave him authority . . . to act on [their behalf]." *Id.* at 542. However, that argument is now foreclosed by *United States v. Dubin*, 27 F.4th 1021 (5th Cir. 2022) (en banc). There, our en banc court adopted the panel's opinion, which found the "use" requirement satisfied when a person employs another's means of identification without permission and in furtherance of a crime, even if said means were initially acquired legally. *United States v. Dubin*, 982 F.3d 318, 326–27 (5th Cir. 2020), *adopted by*, 27 F.4th 1021, 1021– 22 (5th Cir. 2022) (en banc). The same is true here: no matter how he acquired the names and certifications of the four individuals, he submitted them to the TVC (thus using the individual's names) without lawful authority in furtherance of his wire-fraud scheme. As Croft now all but concedes, *Dubin* disposes of his argument that he did not "use" the names of the four individuals within the meaning of the aggravated identity theft statute. There was sufficient evidence supporting Croft's convictions under that statute.

## C. Money Laundering

We now briefly turn to Croft's objections to his money-laundering conviction. "To sustain a conviction under the money laundering promotion statute, the Government must show that the defendant: (1) conducted or attempted to conduct a financial transaction, (2) which the defendant then knew involved the proceeds of unlawful activity, (3) with the intent to promote or further unlawful activity." *United States v. Miles*, 360 F.3d 472, 477 (5th Cir. 2004). Croft's sole challenge to his money-laundering convictions hinges on his challenge to his wire-fraud convictions—because there was no wire fraud, he argues, there were no proceeds from said fraud

No. 21-50380

that could have been laundered. Because we affirm Croft's convictions for wire fraud, we correspondingly affirm his convictions for money laundering related to the proceeds from that fraud.

### D. Restitution and Forfeiture

We last consider Croft's challenge to the district court's orders on restitution and forfeiture. We review the legality of restitution orders de novo. *United States v. Swenson*, 25 F.4th 309, 322 (5th Cir. 2022). Factual findings underpinning the restitution order are reviewed for clear error. *United States v. Beydoun*, 469 F.3d 102, 107 (5th Cir. 2006). The same framework—de novo review of the law, clear error review of the factual findings—applies to forfeiture orders as well. *United States v. Reed*, 908 F.3d 102, 110, 125 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 2655 (2019).

Like his challenges to his money-laundering convictions, much of Croft's argument related to the restitution and forfeiture orders rely on his assertion that insufficient evidence supports his wire-fraud convictions. He argues that no wire fraud occurred requiring restitution, and that there can be no nexus allowing for forfeiture between property and a nonexistent crime. Because we find there was sufficient evidence to support the wire-fraud convictions, these arguments are without merit.

And there is no other issue with the district court's orders. "[W]here a fraudulent scheme is an element of the conviction, the court may award restitution for 'actions pursuant to that scheme.'" *Swenson*, 25 F.4th at 322 (quoting *United States v. Cothran*, 302 F.3d 279, 289 (5th Cir. 2002)). The United States government paid Croft over $1.5 million dollars for veterans to be taught by the certified instructors approved by the TVC; numerous veterans had money taken from their accounts with the VA to pay for that training. But the veterans did not receive that promised training, but instead received training of unknown quality. Because of that fact, the government

10

proffered, without objection, that during the investigation agents sent "a bulletin to all law enforcement agencies in the United States warning them about this problem" with Universal K-9. The extent of actual, beneficial training that the veterans might have received is beside the point. Universal K-9's operations and teaching of veterans was "'systematically tainted with fraud' and it was impossible to tell which services were legitimate versus illegitimate." *United States v. Karie*, 976 F.3d 800, 805 (8th Cir. 2020) (quoting *United States v. Miell*, 661 F.3d 995, 1001 (8th Cir. 2011)). The district court's order of restitution for the entire amount of money Croft was paid by the VA was not erroneous.

As to the forfeiture, Croft's sole argument on appeal, aside from the challenge to his convictions, boils down to a single sentence: "[T]he Government has failed to prove the above references nexus necessary for forfeiture." "A party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it." *United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010) (quoting *Knatt v. Hosp. Serv. Dist. No. 1 of E. Baton Rouge Parish*, 327 F. App'x 472, 483 (5th Cir. 2009)). Croft's single sentence reference to a lack of the required "nexus," without any further explanation or argument, is insufficient to satisfy the requirement that "a party must 'press' its claims." *Id.* at 447 (quoting *Knatt*, 327 F. App'x at 483). In any event, the district court's findings that Croft "engaged in a pattern of deceit," "placed virtually every asset there was in somebody else's name," and "held an iron grip and controlled everything that was going on at that facility," and that therefore all of the seized assets could be traced to Croft and his monies procured by fraud were not erroneous, let alone clearly erroneous. We affirm the restitution and forfeiture orders.

No. 21-50380

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.